UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

)
UNITED STATES OF AMERICA,                    )
                                             )
                                             )    Misc. Nos.    06-123
            v.                               )                  06-124
                                             )                  06-125
I. LEWIS LIBBY,                              )                  06-126
                                             )                  06-128
                        Defendant.           )                  06-169
_____ )
                                             )
NBC NEWS, MATTHEW COOPER,                     )
JUDITH MILLER, ANDREA MITCHELL, )
TIME INC., AND                               )
THE NEW YORK TIMES,                          )
                                             )
                        Movants.             )
_____ )


**<u>MEMORANDUM OPINION</u>**

On February 27, 2006, this Court issued an order permitting the defendant to serve

subpoenas <u>duces</u> <u>tecum</u> on news reporters and news organizations with production dates well in

advance of the scheduled trial date as authorized by Federal Rule of Criminal Produce 17(c)(1).

February 27, 2006 Order.  Consistent with this Order, the defendant served Rule 17(c) subpoenas

on a number of news reporters and news organizations.  Currently before the Court are motions

to quash from NBC News, Andrea Mitchell, Time Inc.,[1] Matthew Cooper, <u>The New York Times</u>,

and Judith Miller ("movants").[2]  Upon consideration of the papers filed in connection with these

---

[1] Time Inc.'s motion also seeks modification of the subpoena it has received.

[2] The following papers have been filed in connection with these motions: (1) Memorandum of Points and

(continued...)

motions to quash and the oral arguments heard by the Court on these motions, for the reasons set forth below, Judith Miller's motion is granted, but all other motions are granted in part and denied in part.

## I.    Background

The facts of this case are well-known to the parties and have been previously discussed in this Court's earlier Memorandum Opinions. See United States v. Libby, ____ F. Supp. 2d ____, ____, 2006 WL 574260, at *1 (D.D.C. March 10, 2006); United States v. Libby, ____ F. Supp. 2d ____, ____, 2006 WL 1109454, at *1-2 (D.D.C. Apr. 27, 2006). It is helpful, nonetheless, to briefly review the facts as they relate to the motions currently before the Court.

The defendant is charged in a five-count indictment with obstruction of justice in violation of 18 U.S.C. § 1503 (2000), two counts of false statements in violation of 18 U.S.C. § 1001(a)(2) (2000), and two counts of perjury in violation of 18 U.S.C. § 1623 (2000). Indictment at 1. All of these charges arise from a criminal investigation into the possible unauthorized disclosure of classified information—Valerie Plame Wilson's affiliation with the

------

[2](...continued)
Authorities in Support of Motion of Non-Parties NBC News and Andrea Mitchell to Quash Subpoenas ("NBC's Mem."); (2) Memorandum of Points and Authorities in Support of Time's Motion to Quash or Modify ("Time's Mem."); (3) Motion to Quash Subpoena to Matthew Cooper ("Cooper Mot."); (4) The New York Times' Motion to Quash Defendant I. Lewis Libby's Rule 17(c) Subpoena, and Supporting Memorandum of Law ("N.Y. Times' Mem."); (5) Motion of Judith Miller to Quash Subpoena and Supporting Memorandum of Points and Authorities ("Miller's Mem."); (6) I. Lewis Libby's Consolidated Response to Motion to Quash by NBC News, Judith Miller, Andrea Mitchell, Matthew Cooper, Time Inc., and The New York Times, and Memorandum of Law in Support ("Def.'s Opp'n"); (7) Reply Memorandum in Support of Motion of Non-Parties NBC News and Andrea Mitchell to Quash Subpoenas ("NBC Reply"); (8) Reply Brief of Time Inc. In Support of Its Motion to Quash or Modify ("Time Reply"); (9) Reply of Matthew Cooper in Support of His Motion to Quash ("Cooper Reply"); (10) The New York Times' Reply to Defendant I. Lewis Libby's Response to Motion of the New York Times to Quash Libby's Rule 17(c) Subpoena ("N.Y. Times' Reply"); and (11) Reply of Judith Miller in Support of Motion to Quash ("Miller Reply"). The defendant acknowledges compliance with the subpoenas served on Tim Russert, CNN, and The Washington Post, Def.'s Opp'n at 2 n.1, and thus these subpoenas are not the subject of any of the pending motions.

Central Intelligence Agency ("CIA")—to several journalists.  Indictment at 8, ¶ 25.  Specifically,

the charges against the defendant are predicated upon statements that the defendant allegedly

made to Special Agents of the Federal Bureau of Investigation ("FBI") in October and

November, 2003, id. at 9, ¶ 26, and testimony he provided to a grand jury in March 2004, id. at

11, ¶ 30.  The alleged false statements occurred when the defendant recounted to the FBI Agents

and the grand jury conversations he had with news reporters Tim Russert, Judith Miller, and

Matthew Cooper in June and July 2003.  See generally Indictment at 11-22.

        The charges against the defendant are based entirely upon what the defendant has said

was discussed during his conversations with these news reporters.  Accordingly, documents and

information possessed by the various news reporters and news organizations played a central role

during the grand jury investigation that led to the issuance of the indictment.  See In re Special

Counsel Investigation, 332 F. Supp. 2d 26 (D.D.C. 2004), aff'd, In re: Grand Jury Subpoena,

Judith Miller, 438 F.3d 1141 (D.C. Cir. 2006), reissuing, 397 F.3d 964 (D.C. Cir. 2005), cert.

denied, 125 S. Ct. 2977 (June 27, 2005).  And, as evidenced by the motions that are the subject

of this opinion, the significance of the media's role has not diminished.

        Based upon the government's earlier representations, it is clear that the government has

provided the defendant all documents in its possession that he is entitled to receive at this time[3]

that discuss the defendant's conversations he allegedly had with reporters Miller, Russert, and

Cooper.  The defendant now seeks additional documents and information from these reporters, as

---

[3]  The government has not yet produced documents discoverable under either the Jencks Act, 18 U.S.C.
§ 3500 (2000), or Giglio v. United States, 405 U.S. 150 (1972), but has informed the Court that it intends to produce
those documents and information well in advance of the trial.

well as, among others,[4] NBC News, Time Inc., and The New York Times, pursuant to Rule 17(c)

subpoenas.  All six have filed motions to quash the defendant's subpoenas.  These motions assert

(1) that the subpoenas issued to them do not comport with the requirements of Rule 17(c), and

(2) that a reporters' privilege under either the United States Constitution or the common law

protects the subpoenaed material from disclosure.[5]  The Court's analysis of these challenges must

first begin with Rule 17(c) itself.  Harmon v. Brucker, 355 U.S. 579, 581 (1958) (It is well-settled

that a Court should "avoid deciding constitutional questions presented unless essential to proper

disposition of a case").  Only if the Rule 17(c) challenges are rejected need the Court address the

privilege arguments.

## II.    Federal Rule of Criminal Procedure 17(c)

Federal Rule of Criminal Procedure 17(c) provides:

> (1) In General.  A subpoena may order the witness to produce any books, papers,
> documents, data, or other objects the subpoena designates. The court may direct the
> witness to produce the designated items in court before trial or before they are to be
> offered in evidence. When the items arrive, the court may permit the parties and their
> attorneys to inspect all or part of them.
>
> (2) Quashing or Modifying the Subpoena.  On motion made promptly, the court may
> quash or modify the subpoena if compliance would be unreasonable or oppressive.

Fed. R. Crim. P. 17(c).  The Supreme Court has concluded that Rule 17(c) is "not intended to

provide a means of discovery for criminal cases," but was meant "to expedite the trial by

providing a time and place before trial for the inspection of subpoenaed materials."[6]  Nixon v.

---

[4]  See footnote 2, supra.

[5]  Miller does not assert either a First Amendment or common law privilege in her motion, but does claim
that the subpoena "impinges on personal and sensitive professional contacts."  Miller Mem. at 1.

[6]  The standard applicable to the production of documents articulated in this section of the opinion is the

(continued...)

United States, 418 U.S. 683, 698-99 (1974) (citing Bowman Dairy Co. v. United States, 341 U.S. 214, 220 (1951)); see United States v. Cuthbertson, 630 F.2d 139, 146 (3d Cir. 1980) (Cuthberston I) ("Courts must be careful that rule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases found in Fed. R. Crim. P. 16."); United States v. Haldeman, 559 F.2d 31, 75 (D.C. Cir. 1976) (Rule 17(c) "is  not a discovery device, [it] confines a subpoena duces tecum to admissible evidence, [and] authorizes the quashing of the subpoena if it is 'unreasonable or oppressive.'") (footnotes omitted).  Accordingly, "Rule 17(c) may be used to obtain only evidentiary materials."  United States v. Cherry, 876 F. Supp. 547, 552 (S.D.N.Y. 1995) (citing Bowman Dairy Co., 341 U.S. at 221 ("[A]ny document or other materials, admissible as evidence, obtained by the Government by solicitation or voluntarily from third persons is subject to subpoena.")).  The Rule "is designed as an aid for obtaining relevant evidentiary material that the moving party may use at trial." Cuthbertson I, 630 F.2d at 144.  Thus, "Rule 17(c) can be contrasted with the civil rules which permit the issuance of subpoenas to seek production of documents or other materials which, although not themselves admissible, could lead to admissible evidence."  Cherry, 876 F. Supp. at 553 (citing United States v. Marchisio, 344 F.2d 653, 669 (2d Cir. 1965)).  As the Third Circuit has noted, there is a difference between:

> exculpatory material in the possession of the prosecution, generally available [to a criminal defendant] under the teachings of Brady v. Maryland, and exculpatory evidence in the possession of third parties.  Only the latter is retrievable under a rule 17(c) subpoena; naked exculpatory material held by third parties that does not rise to the dignity

[6](...continued)

standard applied to subpoenas duces tecum issued in connection with a trial.  The Supreme Court has enunciated a slightly different analysis for subpoenas duces tecum issued in connection with grand jury proceedings.  See United States v. R. Enterprises, Inc., 498 U.S. 292, 297-304 (1991).

of admissible evidence simply is not within the rule.

United States v. Cuthbertson, 651 F.2d 189, 195 (3d Cir. 1981) ("Cuthbertson II").

Before Nixon, most courts required a party seeking production of documents under Rule 17(c) to show:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

Nixon, 418 U.S. at 699-700 (citing United States v. Iozia, 13 F.R.D. 335, 338 (S.D.N.Y. 1952)). Guided by these factors, the Supreme Court in Nixon concluded that to compel production of documents under Rule 17(c), the party seeking production "must clear three hurdles: (1) relevancy; (2) admissibility; and (3) specificity." Id. at 700. A subpoena that fails to satisfy these three requirements will be deemed unreasonable or oppressive and must be either quashed or modified. See, e.g., Cuthbertson I, 630 F.2d at 145 (concluding, in part, that the district court properly modified a Rule 17(c) subpoena); United States v. North, 708 F. Supp. 402, 404 (D.D.C. 1989) (holding that the government's Rule 17(c) subpoena had to be quashed because it failed to satisfy the relevance, admissibility, and specificity requirements).

The first prong of this test—relevance—requires the Court to assess whether the documents sought have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. If the documents are deemed relevant, the Court must then determine whether they would be admissible. This inquiry is largely governed by the Federal

Rules of Evidence.  See, e.g., Fed. R. Evid. 401-415, 801-807.  Under these Rules, documents

sought pursuant to a Rule 17(c) subpoena can be deemed admissible for a variety of purposes,

including impeachment.  Nixon, 418 U.S. at 701; United States v. LaRouche Campaign, 841

F.2d 1176, 1180 (1st Cir. 1988) (concluding that it was proper to disclose impeachment evidence

before trial pursuant to a Rule 17(c) subpoena because the "putative key witness, whose general

testimony is already known, is scheduled to testify"); see Fed. R. Evid. 801(d)(1).  But see

Cuthbertson II, 651 F.2d at 195 (concluding that district court erred in requiring disclosure of

Rule 17(c) documents that contained potential impeachment evidence before the witness who

made the statement testified at trial).  Admittedly, it will often be difficult at the pretrial stage to

determine with precision the admissibility of certain documents; therefore, if a document is

arguably relevant and admissible under the Rules of Evidence, the Nixon "evidentiary"

requirement is likely satisfied.  See United States v. Orena, 883 F. Supp. 849, 868 (E.D.N.Y.

1995).

        In addition to seeking documents that are both relevant and admissible, a Rule 17(c)

subpoena must also be specific.  Although the Supreme Court in Nixon requires that a party

issuing a Rule 17(c) subpoena identify with specificity the documents being sought, the Court

recognized that in some instances it may be impossible to "describe fully" the documents;

therefore, the Court concluded that the specificity requirement could be satisfied if there is a

"sufficient likelihood," demonstrated through rational inferences, that the documents being

sought contain relevant and admissible evidence.  Nixon, 418 U.S. at 700.  While "exquisite

specificity" is not required, United States v. Poindexter, 727 F. Supp. 1501, 1510 (D.D.C. 1989),

courts will not approve a subpoena for documents based upon requests for disclosure from broad

categories of documents. <u>North</u>, 708 F. Supp. at 404. In fact, "[i]f the moving party cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes that something useful will turn up, this is a sure sign that the subpoena is being misused." <u>United States v. Noriega</u>, 764 F. Supp. 1480, 1493 (S.D. Fla. 1991). The specificity requirement ensures that a Rule 17(c) subpoena will not be used as a "fishing expedition to see what may turn up." <u>United States v. King</u>, 164 F.R.D. 542, 545 (D. Kan. 1996) (quoting <u>Noriega</u>, 764 F. Supp. at 1493) (internal quotation marks omitted). It is important to remember that "one of the major purposes of the specificity requirement is to provide the subpoenaed party or other party having standing with enough knowledge about what documents are being requested so as to lodge any objections on relevancy or admissibility." <u>United States v. Anderson</u> 31 F. Supp. 2d 933, 945 (D. Kan. 1998).

 Generally, courts assess compliance with the <u>Nixon</u> standard based solely on the content of the subpoena itself, coupled with the papers submitted by the parties in connection with a motion to quash or modify. However, during the May 16, 2006 hearing on the motions to quash, counsel for Miller invited the Court to conduct an <u>in</u> <u>camera</u> review of responsive documents. The Court inquired whether the other movants would object to such review by the Court of their documents also, and all agreed that documents responsive to the defendant's Rule 17(c) subpoenas would be provided to the Court. While courts generally do not to resort to <u>in</u> <u>camera</u> review of responsive documents, <u>Ideal Elec. Co. v. Flowserve Corp.</u>, 230 F.R.D. 603, 610 (D. Nev. 2005), because the movants have indicated that the number of responsive documents is not extensive, and the Court wants to ensure that documents the defendant is entitled to receive are produced, the Court acquiesced to the movants' willingness to have the Court conduct <u>in</u> <u>camera</u>

8

inspection of documents they have identified as responsive to the defendant's Rule 17(c) subpoenas. And as demonstrated below, the movants' willingness to provide the Court with the responsive documents has allowed the Court, in most instances, to conclusively determine whether the defendant has satisfied the <u>Nixon</u> standard and whether the Court should require the production of some or all of the responsive documents.

(A)    <u>The Judith Miller Subpoena</u>

The Miller subpoena seeks production of eight categories of documents. Miller Mem., Ex. B. However, according to Miller, she has only found documents—her reporter's notes, work-related phone records, and an appointment calendar—that are responsive to four of the eight categories. Miller Mem. at 3-4; Miller Reply at 1 n.2. According to Miller, these documents are responsive only to requests one, two, three and six.[7] These requests are the following:

1.    The complete unredacted original notebooks from which copies of certain pages were produced to the grand jury or Office of Special Counsel in this matter.

2.    All appointment calendars, telephone logs and records of telephone calls placed or received by you during the period of June 7 to July 14, 2003.

3.    All documents prepared or received by you prior to July 14, 2003 that refer to the wife of former Ambassador Joseph Wilson, whether by name or otherwise.

\*    \*    \*

6.    All documents prepared at any time by you, or based upon information received from you, that refer or purport to describe any part of any conversation between you and I. Lewis Libby on June 23, July 8, or July 12, 2003, or any telephone calls between you and I. Lewis Libby at any time during June or July 2003. This request includes but is not limited to drafts of an article entitled "A Personal

---

[7] Since Miller asserts she has no documents responsive to requests four, five, seven or eight, the Court need not examine whether those requests satisfy the standard for production under Rule 17(c).

          Account:  My Four Hours Testifying in the Federal Grand Jury Room" published
          October 16, 2005.

Miller Mem., Ex. B.  According to Miller, the documents she has discovered that the defendant

does not already have and are responsive to these requests do not "relate to any conversations

between Mr. Libby and any news reporter, or to conversations Ms. Miller had with any other

individuals with respect to either Mr. Libby, Ms. Plame, or her husband Joseph Wilson" and thus

do not fall within the scope of the <u>Nixon</u> standard.  Miller Mem. at 5-7.  The defendant claims,

however, that the subpoena served on Miller satisfies the requirements of Rule 17(c) as

established by <u>Nixon</u>.  The defendant argues first that Miller's recollection of the conversations

between her and the defendant will play a central role in the case.  Def.'s Opp'n at 10-11.  As

such, the defendant claims that during the trial he will be entitled to "contend that Ms. Miller's

stated recollection is by no means sufficiently reliable to prove that the conversations occurred as

the government alleged."  <u>Id.</u> at 12.  To do this, the defendant asserts that he needs the

unredacted, original notebooks in which those conversations were recorded; Miller's

appointment calendars and telephone logs for the period during which the conversations took

place; documents prepared or received by Miller prior to July 14, 2003 that refer to Ambassador

Wilson's wife; and documents which purport to describe the conversations Miller had with the

defendant.  <u>Id.</u>  As an example of why he needs these documents, the defendant opines that the

portions of Miller's notebooks the government has provided to him contain notations relating to

Ambassador Wilson and Valerie Wilson that were likely made before Miller spoke with the

defendant.  <u>Id.</u> at 13.  The defendant posits that the unredacted versions of these notebooks would

afford him the ability to confront Miller regarding when she learned about Valerie Wilson and

from whom.  Id.  Moreover, the defendant suggests that

> [e]ven if Ms. Wilson's name is not mentioned, notes reflecting the identity of other government officials or reporters to whom Ms. Miller spoke and records reflecting when she spoke to them—combined with information already known to the defense—will allow us to identify who, other than Libby, may have disclosed Ms. Wilson's CIA affiliation to Miller and when those conversations may have occurred—and to ask Ms. Miller about this at trial.

Id. at 14-15.  The Court need not engage in a lengthy discussion of the documents responsive to the Miller subpoena that are at issue because these documents are simply not relevant.

The Court will first address Miller's two notebooks.  Counsel for Miller represented during the May 16, 2006 hearing that he and Miller have reviewed every page in the two notebooks and that all information regarding Ambassador Wilson, his trip to Niger, or Valerie Plame Wilson had been turned over to the Special Counsel.  May 16, 2006 Hearing Transcript ("Tr.") at 37.  In fact, Miller's counsel indicated that, to the extent Miller was unsure about what an entry was referencing, such information was also given to the Special Counsel.  Id.  This Court has also painstakingly examined each page of Miller's two notebooks and must conclude, consistent with Miller's counsel's representations, that nothing in the notebooks, other than the material previously produced to the Special Counsel, who in turn provided it to the defendant, would be relevant to the defense.  This Court can certainly appreciate the defendant's desire to access Ms. Miller's notebooks, and his frustration resulting from not being able to view them to personally assess the relevance of every entry.  However, it is this Court's firm conclusion after reviewing the notebooks that providing them to the defendant would not assist him in any way in his attempt to determine who may have provided information to Miller about Ambassador

Wilson, his trip to Niger, or Valerie Plame Wilson, or when she acquired such information.[8]  As

such, the notebooks, other than those redacted pages already produced to the Special Counsel and

the defendant, are simply not relevant to the defense and the Court will therefore not require their

production pursuant to a Rule 17(c) subpoena.   See United States v. Nektalov, No. S203CF.828,

2004 WL 1574721, at *3 (S.D.N.Y. 2004) (quashing Rule 17(c) subpoena because the

documents sought were not relevant); United States v. Agboola, No. 00-100, 2001 WL 1640094,

at *5 (D. Minn. 2001) (quashing Rule 17(c) subpoena because the defendant simply believed the

documents would be relevant to his case).

       In addition, the Court will not require Miller to produce either her appointment calendar

or her telephone records.  After reviewing these documents, and considering the basis for the

defendant's requests to obtain them, this Court must conclude that the defendant has failed to

satisfy Nixon's specificity requirement.  In fact, the requests again appear to be nothing more

than a fishing expedition.  Specifically, the defendant has not provided this Court with any basis

upon which it can draw a reasonable inference that there is a real likelihood that the telephone

records and calendar would contain relevant and admissible evidence.  Compare Nixon, 418 U.S.

at 700 (government's Rule 17(c) subpoena for audio tape recordings was sufficiently specific as

---

[8]  The Court also notes that many of the references to the defendant in Miller's notebooks simply reflect that Miller intended to contact him, i.e., he was on her "to do" list.  The defendant will undoubtedly believe that he should have access to these "to do" lists to ascertain who Miller may have spoken to on a day she also talked with the defendant.  As the defendant has argued, "notes reflecting the identity of other government officials or reporters to whom Ms. Miller spoke and records reflecting when she spoke to them—combined with information already known to the defense—will allow us to identify who, other than Libby, may have disclosed Ms. Wilson's CIA affiliation to Miller and when those conversations may have occurred—and to ask Ms. Miller about this at trial."  Def.'s Opp'n at 14-15.  However, the argument as phrased clearly reveals that the defendant is on a discovery fishing expedition, which is an impermissible use of Rule 17(c).  See Nixon, 418 U.S. at 699 (citing Iozia, 13 F.R.D. at 338 ).  Moreover, Miller's counsel's representation to the Court during the hearing on this matter that he and Miller reviewed each entry in the notebooks and have concluded that all entries relating to Ambassador Wilson, his trip to Niger, or Ms. Wilson are already in the defendant's possession further demonstrates that the other entries in the notebooks have no relevancy to this case.

it identified the participants and time when the recordings were made and the government offered

sworn testimony from some of the participants as to what was on the recordings).  In fact, it

appears that the defendant seeks these documents for the purpose of trying to determine who

Miller spoke to or met with, which the defendant will then attempt to cross reference with

information he currently possesses concerning who knew of Ms. Wilson's affiliation with the

CIA.  The purpose of this exercise would be to help determine who, other than the defendant,

Miller "may have disclosed Ms. Wilson's CIA affiliation to."  Def.'s Opp'n at 14-15.  This

exercise would be a classic fishing expedition, which cannot be sanctioned by this Court.  In

essence, the defendant is simply seeking to examine general categories of documents with the

hope that they contain information that may be helpful to his defense (to explore whether Miller

may have learned of Ms. Wilson's CIA affiliation from other sources).  This is not the proper

role Rule 17(c) subpoenas are intended to play in the criminal arena.  Rather they may be used

solely to secure specifically identified evidence for trial that is relevant and admissible.

Accordingly, Ms. Miller's appointment calendar and telephone records need not be produced.

See United States v. Mays, 246 F.3d 677, 2000 WL 1860727, at *1 (9th Cir. 2000) (unpublished)

(affirming district court's quashing of a Rule 17(c) subpoena on the grounds that it was a "fishing

expedition" because it requested "all documents relating to any and all disciplinary action taken

by the California Highway Patrol and San Bernardino Police Department against HINET

lieutenants, sergeants, and officers, without any time limitation"); United States v. Louis, No. 04-

cr-203, 2005 WL 180885, at *5-6 (S.D.N.Y. Jan. 27, 2005) (quashing Rule 17(c) subpoena that

sought "'any and all' documents relating to several categories of subject matter (some of them

quite large), rather than specific evidentiary items").

B.    The New York Times' Subpoena

The defendant's subpoena served on The New York Times seeks six categories of

documents.  Specifically, the defendant seeks documents which are responsive to the following

requests:

1. All documents prepared or received by any employee or agent of The New York Times
(including but not limited to Nicholas Kristof and Judith Miller) prior to July 14, 2004
that refer to the wife of Ambassador Joseph Wilson, whether by name or otherwise.

2.  All documents, whenever prepared or received, indicating or suggesting that any
employee or agent of The New York Times (including but not limited to Nicholas Kristof
and Judith Miller) was aware, prior to July 14, 2003, that the wife of former Ambassador
Joseph Wilson was employed by the CIA.[9]

3.  All documents prepared at any time by Judith Miller, or by any other employee or
agent of The New York Times based upon information received from Judith Miller, that
refer or purport to describe any part of any conversation between Judith Miller and I.
Lewis Libby on June 23, July 8, or July 12, 2003, or any telephone calls between Judith
Miller and I. Lewis Libby at any time during June or July 2003. This request includes but
is not limited to drafts of an article entitled "A Personal Account: My Four Hours
Testifying in the Federal Grand Jury Room" published October 16, 2005.

4.  All documents, whenever prepared or received, reflecting or referring to any request or
recommendation by Judith Miller, prior to July 14, 2003, to Jill Abrahamson or any other
employee or agent of The New York Times, to pursue a news story or investigation
relating to former Ambassador Joseph Wilson's trip to Niger or his claims concerning
that trip.

5.  All documents reflecting or pertaining to a conversation between Judith Miller and
George Freeman concerning Valerie Plame, described in the Vanity Fair article published
in March 2006 under the byline of Marie Brenner, in which Ms. Miller is reported to have
told Mr. Freeman, inter alia, that she talked to many people in the government about Ms.
Plame before and after Novak's article.

6. All documents reflecting communications by any employee or agent of The New York
Times concerning former Ambassador Joseph Wilson prior to July 14, 2003, with any of
the following persons:  Ari Fleischer, Mark Grossman, Eric Edelman, Bob Grenier, Cathy

_____

[9]  In correspondence between The New York Times and the defendant's counsel, the defendant has limited
the time frame for requests one and two to documents from on or after January 1, 2003.

Martin, Joseph Wilson, George Tenent, and Bill Harlow.

N.Y. Times' Mem., Ex. A.  During oral argument, however, the defendant withdrew his request

for drafts of articles from news reporters other than Miller.  Tr. at 52.   And The New York

Times has represented that it has no documents from reporters, other than Miller, that would be

responsive to categories one and two.  Id. at 85.  Of the remaining requests, the New York Times

appears to concede that it has documents responsive to request three and that this request satisfies

the Nixon standard.  N.Y. Times' Mem. at 1 ("Category Nos. 1, 2, 4, 5, and 6 . . . fail one or all

of the criteria for enforcement of a Rule 17(c) subpoena").  In fact, The New York Times has

produced these documents—draft articles—to the Court for its in camera review,[10] and it is clear

from the Court's examination that the documents responsive to this specific request are not only

relevant, but will clearly be admissible as impeachment evidence.[11]  However, The New York

Times argues that the remaining requests fail to satisfy the Nixon requirements for a Rule 17(c)

subpoena.

    As for requests one, two, four and five, the defendant is seeking documents to challenge

Miller's credibility and recollection concerning conversations she had with the defendant.  Def.'s

---

[10]  The New York Times did not produce for in camera inspection draft articles or interviews of other news
reporters or employees of The New York Times.  And during the oral argument on May 16, 2006, the defendant's
attorney withdrew his request for drafts of articles by reporters other than Miller.  Moreover, these documents would
clearly be inadmissible as there is no indication by either party that any current or former employee of The New
York Times, other than Miller, will be a witness during the trial in this case.  Thus, these requests seek non-witness
impeachment evidence, which do not qualify for admissibility under any rule of evidence.  See, e.g., United States v.
Pena, 949 F.2d 751, 758 (5th Cir. 1991) (non-witness impeachment evidence is not material); United States v.
Storey, 956 F. Supp. 934, 942 (D. Kan. 1997) (non-witness impeachment evidence is not discoverable); United
States v. Coggs, 752 F. Supp. 848, 849 (N.D. Ill. 1990) (non-witness impeachment evidence need not be disclosed
under Giglio).  The same is true for all of the other movants' challenges to the production of such information as
well.  Thus, the Court will concern itself only to documents relating to Miller, Cooper, or Russert.

[11]  The Court will discuss the timing of the production of these and other documents in a later section of this
opinion.

Opp'n at 22-24.  Documents sought under Rule 17(c) for impeachment purposes have generally been deemed by other courts to satisfy Nixon's relevance and admissibility requirements.  See, e.g., Nixon, 418 U.S. at 701; LaRouche Campaign, 841 F.2d at 1180; Cuthbertson II, 651 F.2d at 195.  The New York Times contends, however, that documents responsive to these requests are not relevant because they would not make it more or less probable that the defendant's testimony before the grand jury and his statements to the FBI Agents were true.  N.Y. Times' Mem. at 8-9.  The New York Times' view of relevance is overly restrictive.  There can be no doubt that documents that would tend to show that the defendant accurately relayed to the grand jury and the FBI Agents his conversation with Miller, Cooper, and Russert are relevant to the defendant's effort to defeat the successful prosecution of this action.  In the same vein, documents that would make it more or less probable that Miller, Cooper, or Russert did not accurately recount their conversations with the defendant implicate the likelihood that the conversations occurred as stated by the defendant.  Thus, Miller, Cooper, and Russert's recollection of their conversations with the defendant are equally important as the defendant's recollection of those events.  The documents sought by the defendant in requests one, two, four, and five contain information that go to these critical matters.  For example, if there exist documents responsive to requests one and two that indicate or suggest that Miller was aware of Ms. Wilson's affiliation with the CIA before her first conversation with the defendant, then it is at least arguably more likely that Miller, and not the defendant, interjected the topic into the conversation.  The same is true for documents responsive to request five, which seeks documents "reflecting or pertaining to a conversation between Judith Miller and George Freeman concerning Valerie Plame . . . ."  Documents responsive to this request would demonstrate that Miller may have known Ms.

16

Wilson's name before her conversation with the defendant.  For these reasons, and after reviewing the documents submitted for the Court's in camera review, the Court concludes that documents responsive to requests one, two and five are relevant.

This Court has greater difficulty concluding that documents responsive to request four are relevant.  This request seeks documents "reflecting or referring to any request or recommendation by Judith Miller, prior to July 14, 2003 . . . to pursue a news story or investigation relating to former Ambassador Joseph Wilson's trip to Niger or his claims concerning that trip."  N.Y. Times' Mem., Ex. A.  Although the defendant claims that documents responsive to this request could be used to attack Miller's credibility because there appears to be a dispute as to whether such a request was actually made, Def.'s Opp'n at 23-24, Miller's memory of these events is at best only tangentially related to her memory of her conversations with the defendant.  The relevance of these documents, therefore, is suspect.  In fact, the only possible way documents responsive to this request could be relevant is if the defendant, during his cross-examination of Miller, is permitted to inquire into whether she sought to pursue a story on Ambassador Wilson and his trip to Niger.  However, unless something occurs during the trial which the Court cannot currently envision, it is virtually inconceivable that this line of inquiry will be permitted.[12]

A determination of relevance does not end the Court's inquiry, and the Court must next determine whether documents responsive to categories one, two, four, and five would be admissible.  Documents responsive to these requests would only be admissible as impeachment

---

[12]  Because the Court has in its possession the relevant document, it will reserve ruling on this request until after Miller presents her direct testimony.

evidence.  This limitation is important in two respects.  First, relevant documents responsive to these requests will only be admissible to impeach witnesses who will actually testify.  And second, impeachment evidence only ripens into admissible evidence after the witness has presented testimony at trial.  See Cuthbertson I., 630 F.2d at 145-46.  Courts have concluded that because impeachment evidence is not admissible until after a witness testifies, such evidence need not be produced until that occurs.  Id.; cf. Nixon, 418 U.S. at 701-02.  Other courts, however, have concluded that when a person is almost certain to testify as a witness at trial and there is an indication of what that testimony will be, then pre-trial production is appropriate. LaRouche Campaign, 841 F.2d at 1180 (concluding that it was proper to disclose impeachment evidence before trial pursuant to a Rule 17(c) subpoena because the "putative key witness, whose general testimony is already known, is scheduled to testify").  Here, there can be no doubt that Miller will be a critical witness for the government.  Moreover, various accounts of her conversations with the defendant are contained in both the indictment and in newspaper articles, and thus, it is fairly clear what her testimony will likely be.  Nonetheless, the responsive documents will only become admissible after Miller's direct testimony has been presented by the government.  See Cuthbertson I., 630 F.2d at 145-46.  And the Supreme Court in Nixon has made clear that documents should only be produced pursuant to Rule 17(c) if they are admissible. Nixon, 418 U.S. at 700.  Therefore, this Court cannot accept the proposition that pre-trial disclosure of documents responsive to requests one, two, four, and five is warranted.  This is especially true here because after reviewing the subpoenaed documents (the draft articles and transcripts) and comparing them to the indictment and other news articles reflecting Miller's anticipated testimony, there is no indication that Miller's trial testimony will deviate in any way

18

from her prior written statements.  Accordingly, the Court will retain these documents.  At the conclusion of Miller's direct examination the defendant may, if he chooses, again request that the Court produce these documents for impeachment purposes.[13]

As to the final hurdle established in <u>Nixon</u>, this Court must also conclude that requests one, two, four, and five satisfy the specificity requirement.  Although these requests seek "[a]ll documents," each request provides a narrow subcategory of documents being sought, which cover a discrete topic and typically limit the pertinent time frame.  Moreover, <u>The New York Times</u> apparently had no difficulty locating and producing to the Court documents that it deems responsive to these requests.[14]  <u>See</u> <u>United States v. Skilling</u>, No. H-04-25, 2006 WL 1006622, at *2 (S.D. Tex. Apr. 13, 2006).

Finally, as to category six, this Court must conclude that this request is simply a fishing expedition.  In the broadest of terms, the defendant's request seeks a wide array of documents concerning former Ambassador Joseph Wilson from a variety of individuals.  The defendant opines that he needs these documents to establish that he and "other administration officials" were properly engaged in an effort to rebut the accuracy of Ambassador Wilson's findings.  Def.'s Opp'n at 18.  However, <u>The New York Times</u> has made clear that the defendant is not referenced in any document which is responsive to this request.  <u>N.Y. Times</u>' Mem. at 9.

_____

[13]  Upon such a request, the Court will again review the documents to assess whether they contain any information with impeachment value.  This procedure will not prejudice the defendant as the number of documents at issue is small and typewritten.  Moreover, counsel for <u>The New York Times</u> has indicated that it will not appeal this Court's decision mid-trial if disclosure is ordered.  Tr. at 50-51.

[14]  Even if this Court could conclude that the defendant failed to satisfy the specificity requirement, the Court has discretion to modify the subpoena.  Therefore, this Court can limit the production of documents responsive to requests one, two, four and five to (1) a copy of the transcript of Miller's interview with other <u>New York Times</u> reporters and (2) all drafts of the article published by <u>The New York Times</u> on October 16, 2005, entitled "A Personal Account: My Four Hours Testifying in the Federal Grand Jury Room," by Judith Miller.

Moreover, <u>The New York Times</u> "does not possess records of communication with any such 'administration officials' concerning Joseph Wilson during the time period prescribed in Category 6." <u>N.Y. Times</u>' Reply at 10. As this Court indicated at the May 5, 2006 hearing on the defendant's third motion to compel, while efforts undertaken by the defendant to rebut the accuracy of Ambassador Wilson's claims may likely constitute a valid defense, what others in the administration were doing, unless acting in concert with the defendant, would have no bearing on that defense. Accordingly, this Court cannot conclude that the documents responsive to this request will be admissible, as there is no nexus between these documents and the defendant.

Moreover, the requests in category six entirely fail to satisfy <u>Nixon</u>'s specificity requirement. The defendant here seeks a wide variety of documents relating to a multiplicity of individuals, many whom it is unknown whether they will even be witnesses in this case. <u>North</u>, 708 F. Supp. at 404. In fact, the papers submitted by the defendant do not "reasonably specify the information contained or believed to be contained in the documents sought"; rather, the defendant appears to "merely hope[] that something useful will turn up." <u>Noriega</u>, 764 F. Supp. at 1493; <u>see</u> <u>Mays</u>, 246 F.3d 677, 2000 WL 1860727, at *1; <u>Louis</u>, No. 2005 WL 180885, at *5-6. Therefore, this request is nothing more than an improper fishing expedition.

C.     <u>The NBC News and Andrea Mitchell Subpoenas</u>

The subpoena served on NBC News requests the production of six categories of documents, and the subpoena served on reporter Andrea Mitchell requests the production of five categories of documents. The requests are substantially similar, and NBC and Mitchell filed a

consolidated motion to quash.[15]  NBC News has indicated that it has no documents responsive to the first, second, and fourth categories of documents contained in its subpoena, and Mitchell has noted that she has no documents responsive to the first and second requests contained in the subpoena served on her.  NBC Mem. at 4.  Accordingly, the Court only need address the following requests:

Requests to NBC:

3.  All documents prepared at any time by Tim Russert, or by any other employee of NBC News based in any part upon information received from Tim Russert, that purport to describe any part of a telephone conversation between Tim Russert and I. Lewis Libby on July 10 and/or 11, 2003, or that reflect actions or communications by any NBC New employee during July 2003 as a result of that conversation.

5.  All documents prepared at any time by Andrea Mitchell or by any other employee of NBC News that purport to discuss or explain the statement by Andrea Mitchell on CNBC's "The Capitol Report" aired on October 3, 2003, as follows:

Question: "Do we have any idea how widely known it was in Washington that Joe Wilson's wife worked for the CIA?"

Answer (by Mitchell): "It was widely known among those of us who cover the intelligence community and who were actively engaged in trying to track down who among the foreign service community was the envoy to Niger.  So a number of us began to pick up on that.  But frankly I wasn't aware of her actual role at the CIA and the fact that she had a covert role involving weapons of mass destruction, not until Bob Novak wrote it."

6.  All documents reflecting communications by any employee of NBC News concerning former Ambassador Joseph Wilson prior to July 14, 2003, with any of the following persons:  Ari Fleischer, Mark Grossman, Eric Edelman, Bob Grenier, Cathy Martin, Joseph Wilson, George Tenet and Bill Harlow.

NBC Mem. at 3.  The requests for responsive documents in categories three and four in

---

[15]  Because the subpoenas issued to NBC and Mitchell are substantially similar, the Court's reasoning regarding the resolution of NBC's motion is identical to that of Mitchell's motion, unless otherwise indicated.

Mitchell's subpoena are identical to the requests contained in categories five and six in the NBC

subpoena, except that they are limited to documents prepared by Mitchell or communications by

Mitchell. Id. at 4. The final category of documents the defendant seeks from Mitchell (Mitchell

request five) are "[a]ll documents reflecting or referring to any conversation between you and I.

Lewis Libby during the period July 6, 2003 to October 3, 2003." Id. These movants make clear

that neither possess "(1) any documents, prepared or received by [NBC News or Mitchell] prior

to July 14, 2003, that refer to Ms. Wilson, by name or otherwise, or (2) any documents, whenever

prepared or received, that indicate or suggest that any NBC employee—including Mr. Russert

and Ms. Mitchell—was aware that Ms. Wilson was employed by the CIA prior to July 14, 2003."

Id.

　　　　This Court has, in the preceding section, already demonstrated why request six is nothing

more than a fishing expedition. That same analysis applies equally here. Thus, this Court need

only examine NBC requests three and five, and Mitchell request five. And again, because the

movants have provided the Court the documents which are responsive to these two requests, the

Court need not resolve the question in the abstract. The documents can be easily divided into

two categories: (1) documents responsive to NBC requests three and five relating to Russert and

(2) documents responsive to NBC request three and five or Mitchell request five relating to

Mitchell.

　　　　The Court will first address the documents related to Russert. These documents consist

solely of email communications involving NBC employees. The vast majority of these emails

simply forward, with minimal commentary, NBC's publicly available statement and other related

publicly available news articles. None of the emails reflect comments or notations made by

Russert. These emails therefore simply have no relevancy to whether the defendant's account of the conversation he had with Russert occurred as he allegedly recalled or as Russert contends. In addition, this Court cannot understand under what theory these emails would be admissible. Therefore, these documents need not be produced.

Additionally, the Court will not require the production of the documents relating to Mitchell. Having reviewed Mitchell's handwritten notes, there can be no plausible argument that they are relevant to this case. Not only do they have no bearing on any issue relevant to this action, but there is also no basis for them being used to challenge Russert's recollection or credibility. The remaining emails, while technically responsive to category five, would only be admissible if Mitchell testifies and if her testimony is inconsistent with the statements made therein. Unlike Miller, Cooper, and Russert, there is no clear indication that Mitchell will even testify during the trial. Accordingly, these documents do not fall within the category of documents producible under Rule 17(c).[16]

D.    The Time Inc. and Matthew Cooper Subpoena

The defendant's subpoenas served on Time and Cooper are substantially similar and request the following documents:

1. All documents prepared or received prior to July 14, 2003 by any employee or agent of Time Inc. (including by not limited to Matthew Cooper, John Dickerson, Massimo Calabresi, Michael Duggy and James Carney) that refer to the wife of former Ambassador Joseph Wilson, whether by name or otherwise.

2. All documents, whenever prepared or received, indicating or suggesting that any

---

[16] The Court will, however, refrain from issuing a definitive ruling on all of the Mitchell documents. If Mitchell does testify during the trial, the defendant may request that the Court revisit whether documents responsive to the subpoena issued to her should be produced. Because there are only a limited number of responsive documents that will be at issue, there will be only minimal delay of the trial if Mitchell becomes a witness.

employee or agent of Time Inc. other than Matthew Cooper was aware prior to July 14, 2003 that the wife of former Ambassador Joseph Wilson was employed by the CIA.

3.  All documents prepared at any time by Matthew Cooper, or by any other employee or agent of Time Inc. based in any part on information received from Matthew Cooper, that were prepared in anticipation of or that purport to describe any part of a telephone conversation between Matthew Cooper and I. Lewis Libby on July 12, 2003.  This request specifically includes, but is not limited to, drafts and internal correspondence concerning the article "What I Told the Grand Jury" published in the July 25, 2005 edition of Time Magazine.

4.   All documents reflecting communications by any employee or agent of Time Inc. concerning former Ambassador Joseph Wilson prior to July 14, 2003, with any of the following persons:  Ari Fleischer, Mark Grossman, Eric Edelman, Bob Grenier, Cathy Martin, Joseph Wilson, George Tenet, and Bill Harlow.

5.  The original of the document produced to the grand jury or Office of Special Counsel bearing Bates number MC 0043-44.[17]

6.  All documents reflecting or relating to any conversation between any government official and John Dickerson in early July 2003, urging him to look at who sent former Ambassador Joseph Wilson to Niger.[18]

Time Mem, Ex. A.[19]  As to these requests, Cooper has satisfied request five.  Tr. at 106.  In

addition, Time and Cooper have indicated that they have no documents responsive to requests

number two or six.  Tr. at 99-100.  Moreover, for the same reasons this Court quashed request six

in The New York Times subpoena, request four in the subpoena served on Time and request five

in the subpoena served on Cooper will also be quashed.  Thus, only requests one and three

remain for the Court's evaluation.  Tr. at 101.  As with the other movants, Time and Cooper have

---

[17]  Requests four and five in the subpoena served on Time are respectively numbered five and four in the subpoena served on Cooper.

[18]  This request was not included in the subpoena served on Cooper

[19]  The subpoenas issued to Cooper and Time state that documents previously provided to the grand jury or the Office of Special Counsel need not be produced unless redactions were made prior to their production, in which case, the unredacted documents are requested.  Time Mem., Ex. A

provided this Court with the documents responsive to these two requests, so the Court need not determine in the abstract whether the documents should be produced.

There is one document responsive to request one. As discussed during oral argument, this document consists of the notes from a Time reporter of an interview with Ambassador Wilson. While these notes might be relevant on the question of Cooper's credibility, this would only be the case if several theoretical possibilities could be established; no other basis for their admissibility has been provided by the defendant. And as the document's evidentiary value would only be for impeachment (contradiction), since there is no clear indication that this reporter will even testify during the trial (unlike Miller, Cooper, and Russert), there is no realistic possibility that this document would be admissible.

As for the documents responsive to category three, they consist of drafts and internal correspondence concerning the Time stories "A Question of Trust," "What I Told the Grand Jury," and "What Scooter Libby and I Talked About." Time Reply at 5. During oral argument, Time conceded that if the defendant's subpoena satisfied the Nixon test, then these documents should be produced. Tr. at 104. Time asserts, however, that these documents are not admissible, because there is nothing contained in the drafts that is inconsistent with the published story. Id. at 105. In any event, Time argues that even if the defendant has satisfied the Nixon requirements, these documents should not be produced until after the witnesses has testified. Id. at 7-9. For the following reasons, the Court orders that these documents be provided to the defendant.

First, this third request satisfies Nixon's specificity requirement. It is confined to "drafts and internal correspondence concerning the article 'What I Told the Grand Jury' published in the

July 25, 2005 edition of Time Magazine."  Time. Mem., Ex. A.  Moreover, after the Court's

examination of the documents, there is no question that they are relevant, as they recount the

conversation between Cooper and the defendant, which is the basis for several charges in the

indictment.  See Indictment at 8, ¶ 23 (count one); 17, ¶ 2 (count three); 20. ¶ 2 (count five).

The admissibility of these documents again turns on whether they can be used as impeachment

evidence.  At oral argument on this motion, counsel for Time asserted that the drafts will merely

be cumulative, as the drafts are simply repetitive of the published story.  Id. at 104.  As already

discussed, only after Cooper testifies will documents which impeach his testimony become

admissible.  However, upon reviewing the documents presented to it, the Court discerns a slight

alteration between the several drafts of the articles, which the defense could arguably use to

impeach Cooper.  See TI00011.  Compare TI00030, MCX0013, MCX0021, with, MCX0003,

0005, 00027.[20]  This slight alteration between the drafts will permit the defendant to impeach

Cooper, regardless of the substance of his trial testimony, because his trial testimony cannot be

consistent with both versions.  Thus, unlike Miller, whose documents appear internally consistent

and thus will only be admissible if she testifies inconsistently with these documents, Cooper's

documents will undoubtedly be admissible.  Because of the inevitability that Cooper will be a

government witness at trial, this Court can fathom no reason to delay the production of these

documents to the defendant, as they will undoubtedly be admissible for impeachment.[21]

---

[20]  Because these documents were submitted to the Court for its in camera review, the Court has purposefully excluded what the alteration was.

[21]  These documents should be produced to the defendant within five days of the issuance of this order.

26

### III.    Reporters' Privilege

All of the movants (except for Miller) also assert that they cannot be compelled to disclose the requested documents because they possess both a First Amendment and a common law reporters' privilege.  The Court will discuss each in turn.  Before turning to that discussion, it is important to emphasize that this Court has previously limited what documents need be produced to those relating to the principal news reporters in this case—Miller, Cooper, and Russert.  These three news reporters did not simply report on alleged criminal activity, but rather they were personally involved in the conversations with the defendant that form the predicate for several charges in the indictment.  Their testimony is critical to the government's case, and challenging it will likely be critical to the defense.  Thus, the Court is only concerned here with whether a reporters' privilege exists to shield from disclosure documents relating to these three news reporters.

A.    The First Amendment

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ."  U.S. Const. amend. I.  The First Amendment protections for the press embodied in this Amendment are designed to "preserve an untrammeled press as a vital source of public information," Grosjean v. Am. Press Co., 297 U.S. 233, 250 (1936), ensuring that the press "could bare the secrets of government and inform the people," New York Times Co. v. United States, 403 U.S. 713, 717 (1971) (Black, J., concurring).  As the Supreme Court recognized in New York Times v. Sullivan, 376 U.S. 254, 270 (1964), there is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."  Id. at 270.  Therefore, "[w]ithout an

unfettered press, citizens would be far less able to make informed political, social, and economic

choices." Zerilli v. Smith, 656 F.2d 705, 711 (D.C. Cir. 1981). Accordingly, whenever the

ability of a journalist to gather news is impaired, "the press' function as a vital source of

information is weakened." Id. Therefore, "[c]ompelling a reporter to disclose the identity of a

source may significantly interfere with this news gathering ability[, as] journalists frequently

depend on informants to gather news, and confidentiality is often essential to establishing a

relationship with an informant." Id. (footnotes omitted); see Branzburg v. Hayes, 408 U.S. 665,

681 (1972) ("Nor is it suggested that news gathering does not qualify for First Amendment

protection; without some protection for seeking out the news, freedom of the press could be

eviscerated."). This right, however, is not absolute and the "First Amendment does not

invalidate every incidental burdening of the press that may result from the enforcement of civil or

criminal statutes of general applicability." Branzburg, 408 U.S. at 682.

The questions for the Court to resolve here are (1) whether the First Amendment protects

news reporters from divulging information during a criminal prosecution, and (2) if there is a

First Amendment privilege, whether the defendant's rights trump that privilege. The parties

sharply disagree over whether a First Amendment privilege exists. See N.Y Times' Mem. at 16-

21; Time Mem. at 6-12; Def.'s Opp'n at 37-41.[22] As discussed below, this Court concludes that

the First Amendment does not protect a news reporter, or that reporter's news organization, from

producing documents pursuant to a Rule 17(c) subpoena in a criminal prosecution when the news

---

[22] Although all of the movants, except for Miller, contend that a reporters' privilege protects them from disclosing the requested documents, the papers filed by The New York Times and Time Inc. provide the most comprehensive discussion of the issue for the movants, and thus the Court cites principally to those pleadings as representative of the arguments of all the movants.

reporter is personally involved in the activity that forms the predicate for the criminal offenses charged in the indictment.

It is helpful to begin any discussion of the assertion of a First Amendment reporters' privilege with Branzburg v. Hayes, 408 U.S. 665 (1972).  In Branzburg, the Supreme Court was presented with the following question:  "whether requiring newsmen to appear and testify before state or federal grand juries abridges the freedom of speech and press guaranteed by the First Amendment."  Id. at 687.  The Supreme Court concluded such compulsion does not, and found "no reason to hold that [the Branzburg] reporters, any more than other citizens, should be excused from furnishing information that may help the grand jury in arriving at its initial determination."  Id. at 702.  While the Court recognized that requiring news reporters to reveal their sources would be an imposition, the Court nevertheless concluded that the public's interest in "[f]air and effective law enforcement" outweighed the concerns of the press.  Id. at 690-91. The District of Columbia Circuit has characterized the Branzburg Court's reasoning as "transparent and forceful," recognizing that "the grand jury's authority to subpoena witnesses is not only historic . . . but essential to its task."  In re: Grand Jury Subpoena, Judith Miller, 438 F.3d at 1147 (quoting Branzburg, 408 U.S. at 688) (some internal quotation marks omitted). Accordingly,  "grand juries and the courts operate under the longstanding principle that the public has a right to every man's evidence except for those persons protected by constitutional, common law, or statutory privilege."  Id. (quoting Branzburg, 408 U.S. at 688) (internal quotation marks omitted).  Moreover, the Supreme Court noted that "the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination."  Branzburg, 408 U.S. at 689-90.

And the Court's ultimate holding—that news reporters possess no First Amendment privilege in grand jury proceedings—was "absolute and unreversed." In re: Grand Jury Subpoena, Judith Miller, 438 F.3d at 1148. Thus, the District of Columbia Circuit, relying on Branzburg, affirmed this Court's Chief Judge's refusal to quash a grand jury subpoena issued to Ms. Miller in this very case. Id. at 1149.

Branzburg's holding has not, however, been extended to civil actions. Zerilli, 656 F.2d at 712 ("[e]very other circuit that has considered the question has also ruled that a [reporters'] privilege should be readily available in civil cases, and that a balancing approach should be applied"); see Lee v. Dep't of Justice, 413 F.3d 53, 56-59 (D.C. Cir. 2005). The reporters' privilege in the civil context is qualified, and "courts . . . look to the facts of each case, weighing the public interest in protecting the reporter's sources against the private interest in compelling disclosure" before requiring disclosure. Zerilli, 656 F.2d at 712. In making this assessment, the District of Columbia Circuit has noted that the factors to examine include whether "[t]he civil litigants need for the information he seeks is of central importance, [i.e.] . . . [does] the information sought go to 'the heart of the matter.'" Id. at 713 (citation omitted). And, even if the information is crucial to the litigant's case, disclosure should be compelled only after the "litigant has shown that he has exhausted every reasonable alternative source of information." Id. at 713. The Court also noted that when a reporter "is a party, and successful assertion of the privilege will shield him from liability, the equities weigh somewhat more heavily in favor of disclosure." Id. at 714.

While Branzburg and Zerilli decided whether a First Amendment reporters' privilege exists during grand jury proceedings and in civil actions, neither addressed whether there is a

First Amendment privilege in the context of a criminal prosecution at the trial stage. Moreover, there is no clear case law from this jurisdiction that conclusively resolves that question. Although the movants claim that the District of Columbia Circuit concluded in United States v. Ahn, 231 F.3d 26 (D.C. Cir. 2000), that courts should adopt a balancing approach in criminal cases, no such conclusion was actually reached in Ahn. Rather the Circuit Court in Ahn simply affirmed the district court's quashing of subpoenas issued to news reporters, concluding that "Ahn failed to carry his burden." Id. at 37. This Court therefore cannot accept the proposition that the Circuit Court, by merely concluding that "Ahn failed to carry his burden," established that in criminal cases a news reporter has a qualified First Amendment reporters' privilege that can only be defeated by balancing the public interest in protecting a reporter's sources with a defendant's private interest in compelling disclosure. This Court would not presume that the Circuit Court would, in such a perfunctory manner, resolve such a profound constitutional issue of first impression in this Circuit without actually saying that it was in fact doing so.[23] At most, the Circuit Court in Ahn assumed, without deciding, that the District Court had not erred in applying the balancing test and concluded that the balance had properly been made in that case. This is a far cry from saying that this analysis was required.

Opinions from other jurisdictions further demonstrate that the question of whether there

---

[23] Admittedly, in Judge Tatel's concurrence in In re: Grand Jury Subpoena, Judith Miller, 438 F.3d at 1165, he indicated, in passing, that Ahn limits Branzburg. This could arguably lead to the inference that Ahn stands for the proposition that a balancing test must be employed in criminal cases at the trial stage. However, in Zerilli, the Circuit Court appeared to recognize that this question was unresolved. See Zerilli, 656 F.2d at 712 n.44. And District Court opinions issued before Ahn concluded that the Circuit Court had not provided definitive guidance on the issue. Compare United States v. Liddy, 354 F. Supp. 208, 213 (D.D.C. 1972) (concluding that Branzburg controls with equal force in criminal proceedings and should not be limited only to grand jury proceedings.), with United States v. Hubbard, 493 F. Supp. 202, 205 (D.D.C. 1979) (concluding that in a criminal case a reporters' privilege under the First Amendment "will be upheld unless the information sought is necessary to a just resolution of the case, and it cannot be obtained by alternative means"). Based on the foregoing, it is apparent that the District of Columbia Circuit has not resolved this question, and this Court cannot conclude that it did so in Ahn.

31

is a First Amendment reporters' privilege in criminal prosecutions is still wildly disputed.

Compare LaRouche Campaign, 841 F.2d at 1182 (employing a balancing test); United States v.

Caporale, 806 F.2d 1487, 1504 (11th Cir. 1986) (concluding that to overcome the reporters'

privilege the party seeking the testimony must establish that "the information can show that it is

highly relevant, necessary to the proper presentation of the case, and unavailable from other

sources."); United States v. Burke, 700 F.2d 70, 77 (2d Cir. 1983) (concluding that there is "no

legally-principled reason for drawing a distinction between civil and criminal cases when

considering whether the reporter's interest in confidentiality should yield to the moving party's

need for probative evidence."), limited by, United States v. Cutler, 6 F.3d 67, 73 (2d Cir. 1993)

(holding that Burke should be limited to its facts); United States v. Pretzinger, 542 F.2d 517 (9th

Cir. 1976) (concluding that in a criminal case a district court did not err when it did not require a

news reporter to divulge his sources after balancing the interests of both parties), with United

States v. Smith, 135 F.3d 963, 969 (5th Cir. 1998) (concluding that although some courts have

constructed "a broad, qualified newsreporters' privilege in criminal cases, we decline to do so")

(citations omitted); In re Shaine, 978 F.2d 850, 852 (4th Cir. 1992) (holding that "the incidental

burden on the freedom of the press in the circumstances of this case does not require the

invalidation of the subpoenas issued to the reporters, and absent evidence of governmental

harassment or bad faith, the reporters have no privilege different from that of any other citizen

not to testify about knowledge relevant to a criminal prosecution").[24]

       After carefully reviewing all of the currently existing authority, this Court must conclude

---

[24] But see Shaine, 978 F.2d at 854-55 (Wilkinson, J. concurring) (arguing that the court should have employed a balancing test similar to the test applied in civil cases).

that, in this case, the news reporters and news organizations do not possess a First Amendment

reporters' privilege.  Although the movants suggest that this Court should employ the Zerilli

balancing test, Zerilli requires that approach in civil cases only.  As the Supreme Court has

observed, "the need for information in the criminal context is much weightier because our

historic[al] commitment to the rule of law . . . is nowhere more profoundly manifest than in our

view that 'the twofold aim [of criminal justice] is that guilt shall not escape or innocence

suffer.'" Cheney v. U.S. Dist. Court for the Dist. of Columbia, 542 U.S. 367, 384 (2004) (quoting

Nixon, 418 U.S. at 708-09) (alterations in original).  Thus, since "[t]he need for information for

use in civil cases, while far from negligible, does not share the urgency or significance of

. . . criminal subpoena requests," id., it would simply be inappropriate to employ the same test to

determine whether a First Amendment reporters' privilege exists, especially on the facts in this

case.  Rather, this Court must conclude that the Supreme Court's reasoning in Branzburg applies

with equal force to the trial proceedings in this case as it does in grand jury proceedings.[25]  See

Branzburg, 408 U.S. at 690-91 ("we perceive no basis for holding that the public interest in law

enforcement and in ensuring effective grand jury proceedings is insufficient to override the

consequential, but uncertain, burden on news gathering that is said to result from insisting that

reporters, like other citizens, respond to relevant questions put to them in the course of a valid

grand jury investigation or criminal trial.") (emphasis added); United States v. Liddy, 354 F.

Supp. 208, 215 (D.D.C. 1972).  And this Court agrees with the defendant that "it would be

---

[25]  The Court recognizes that some courts have construed Branzburg as a plurality opinion because of
Justice Powell's concurrence.  See Smith, 135 F.3d at 969.  The District of Columbia Circuit, however, has
concluded that it is a majority opinion, rather than a plurality opinion.  See In re: Grand Jury Subpoena, Judith Miller
438 F.3d at 1148 ("Justice White's opinion is not a plurality opinion of four justices joined by a separate Justice
Powell to create a majority; it is the opinion of the majority of the Court.").

absurd to conclude that a news reporter, who deserves no special treatment before a grand jury

investigating a crime, may nonetheless invoke the First Amendment to stonewall a criminal

defendant who has been indicted by that grand jury and seeks evidence to establish his

innocence."  Def.'s Opp'n at 38-39.

Just as grand jury proceedings are rooted in history and the Constitution, Branzburg, 408

U.S. at 688, so too is a criminal defendant's right to the production and presentation of evidence

during a criminal trial.  U.S. Const. amend. V (no person shall "be deprived of life, liberty, or

property"); U.S. Const. amend. VI (a defendant has the right to be "confronted with the witnesses

against him [and] to have compulsory process for obtaining witnesses in his favor"); Cheney, 542

U.S. at 384 (recognizing a "'fundamental' and 'comprehensive' need for 'every man's evidence'

in the criminal justice system."); Nixon, 418 U.S. at 711 ("The right to the production of all

evidence at a criminal trial similarly has constitutional dimensions  . . . [and it] is the manifest

duty of the courts to vindicate those guarantees, and to accomplish that it is essential that all

relevant and admissible evidence be produced").[26]  Moreover, just as a grand jury has "a right to

every man's evidence," Branzburg, 408 U.S. at 688, the same constitutional and historical

principles underlying the Branzburg ruling guarantee a criminal defendant the right to evidence

that is relevant and will be admissible in his criminal trial.  And finally, as Branzburg recognized,

"the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution

is the Fifth Amendment privilege against compelled self-incrimination,"  id. at 689-90, and it is

beyond this Court's restricted authority to expansively construe the First Amendment to create

---

[26]  While "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to
reasonable restrictions," United States v. Scheffer, 523 U.S. 303, 308 (1998), so too are the limits on a grand jury's
powers, Branzburg, 408 U.S. at 688.

such a new privilege here.  Cheney, 542 U.S. at 384 ("privilege claims that shield information

from a grand jury proceeding or a criminal trial are not to be 'expansively construed, for they are

in derogation of the search for truth'") (quoting Nixon, 418 U.S. at 384) (emphasis added).

Because the Branzburg analysis applies with equal force here, this Court cannot recognize a First

Amendment reporters' privilege to prevent news reporters and news organizations from

producing documents for the defendant's possible use at trial that are both relevant and

admissible.

      In fact, the imposition placed on news reporters by requiring compliance with a Rule

17(c) subpoena is less significant than the burden a news reporter faces when responding to a

grand jury subpoena.  A request for documents under Rule 17(c) must be specific and seek only

relevant and admissible documents.  Nixon, 418 U.S. at 700.  By contrast, a grand jury's

investigative power is "necessarily broad," and is in effect a "grand inquest . . . the scope of

whose inquiries is not to be limited narrowly by questions or propriety or forecasts of the

probable result of the investigation, or by doubts whether any particular individual will be found

properly subject to an accusation of crime."  Branzburg, 408 U.S. at 688 (citation and internal

quotation marks omitted).  It is also important to note that this Court's ruling will not have a

chilling effect on the press and does not swing open the gates for either the government or a

criminal defendant to learn the identity of all sources of a reporter or to gain access to all

information a reporter has amassed.  What the defendant will have access to is necessarily

limited by the standard set forth in Nixon.  See Nixon, 418 U.S. at 699-700.  As such, only

relevant and admissible documents that are requested with specificity must be produced.  And

this will encompass a limited category of documents in a limited number of cases.

See Branzburg, 408 U.S. at 691 ("Only where news sources themselves are implicated in crime or possess information relevant to the grand jury's task need they or the reporter be concerned about grand jury subpoenas. Nothing before us indicates that a large number or percentage of all confidential news sources falls into either category and would in any way be deterred by our holding that the Constitution does not, as it never has, exempt the newsman from performing the citizen's normal duty of appearing and furnishing information relevant to the grand jury's task."). Moreover, as already discussed, only those documents relating to Miller, Cooper, and Russert need to be produced. These three news reporters were not simply reporting on criminal activity; rather, their conversations with the defendant form the predicate for several charges in the indictment. The First Amendment does not protect news reporters or news organizations from producing documents when the news reporters are themselves critical to both the indictment and prosecution of criminal activity. See, e.g., Smith, 135 F.3d at 972-73; Cutler, 6 F.3d at 73. Accordingly, the Court rejects the movants' claim of a First Amendment reporters' privilege at the trial stage of this criminal proceeding.[27]

B.    Common Law Privilege

In the alternative, the movants ask the Court to recognize a reporters' privilege grounded in common law and Federal Rule of Evidence 501. Under Rule 501, federal courts can develop evidentiary privileges in federal question cases according to "the principles of the common law

---

[27] Even if the Court concluded that the movants could assert a qualified First Amendment reporters' privilege, and employed the Zerilli balancing test, for several reasons the defendant would no doubt still be entitled to the requested documents. Zerilli mandates balancing "the public interest in protecting the reporter's sources against the private interest in compelling disclosure." Zerilli, 656 F.2d at 712. First, the documents sought are relevant and admissible; thus, they will make it more or less probable that the defendant committed the acts charged. And second, the type of documents sought, i.e., reporters' notes and draft articles, would only be available from the news reporters or news organizations themselves; therefore, there are no alternative sources from which these documents could be acquired. Id. Thus, any privilege is overcome.

as they may be interpreted . . . in the light of reason and experience." Fed. R. Evid. 501. <u>Jaffee v. Redmond</u>, 518 U.S. 1 (1996), is the Supreme Court's most recent pronouncement of the standard courts should employ when recognizing common law privileges. In <u>Jaffee</u>, the Court recognized a psychotherapist-patient privilege. <u>Id.</u> at 15. In arriving at its conclusion, the Supreme Court acknowledged that

> [t]he common-law principles underlying the recognition of testimonial privileges can be stated simply. For more than three centuries it has now been recognized as a fundamental maxim that the public . . . has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule.

<u>Jaffee</u>, 518 U.S. at 10 (quoting <u>United States v. Bryan</u>, 339 U.S. 323, 331 (1950)) (internal quotation marks omitted). The Court concluded that "[e]xceptions from the general rule disfavoring testimonial privileges may be justified, however, by a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." <u>Id.</u> (internal quotation marks and citation omitted). In reaching its decision, the <u>Jaffee</u> Court paid particular attention to the experience of the various states. <u>Id.</u> at 12-13 & n.11 (reaffirming the principle that "the policy decisions of the States bear on the question whether federal courts should recognize a new privilege").

As indicated, the question before this Court is whether a reporters' privilege should be recognized under Rule 501 and common law. The District of Columbia Circuit was recently presented in this case with the question of whether a reporters' privilege exists in the common law to protect news reporters from testifying before a grand jury. <u>See</u> <u>In re: Grand Jury Subpoena, Judith Miller</u>, 438 F.3d at 1149-50. The Circuit Court, however, did not resolve the

37

common law privilege question.  Rather, a unanimous three-judge panel concluded that if such a common law privilege exists, it had been "overcome."  Id. at 1150.  However, in addition to the unanimous panel decision, each judge wrote separately to communicate their respective perspectives on the common law reporters' privilege question.  Judge Sentelle argued that the law does not support recognition of such a common law privilege, id. at 1153-59, Judge Tatel concluded that common law does, id. at 1163-83, and Judge Henderson opined that the Court did not have to reach the issue since it was clear that the Special Counsel had defeated any privilege the panel could fashion.  id. at 1159-63.

This Court need not engage in a discussion about whether a reporters' privilege should be recognized based on common law principles or whether the Court should adopt Judge Sentelle's or Judge Tatel's position, because there can be no doubt that if such a common law privilege exists, it has been overcome.  In re: Grand Jury Subpoena, Judith Miller, 438 F.3d at 1149-50.  In deciding whether the privilege has been overcome, Judge Tatel wrote that just "as our civil cases balance 'the public interest in protecting the reporter's sources against the private interest in compelling disclosure,' so must the reporters' privilege account for the varying interests at stake in different source relationships."  Id. at 1174 (quoting Zerilli, 656 F.2d at 712).[28]  As already discussed, this balancing test focuses on whether the documents sought are of "central

---

[28]   Judge Tatel went on, however, and concluded that in leak cases, "courts applying the privilege must consider not only the government's need for the information and exhaustion of alternative sources, but also the two competing public interests lying at the heart of the balancing test.  Specifically, the court must weigh the public interest in compelling disclosure, measured by the harm the leak caused, against the public interest in news gathering, measured by the leaked information's value."  Id. at 1175.  These additional balancing factors are not applicable in this case for two reasons.  First, the defendant is not charged with leaking classified information; rather, he is charged with obstruction of justice, perjury, and making false statements.  In addition, these additional factors focus on the pre-indictment stage where there is not yet a recognizable private interest.  At this stage of the proceedings, there is a substantial private interest—the defendant's liberty interests and right to a fair trial—that far outweighs any other interest in this case.

importance" to the case and if the defendant has exhausted all other avenues for acquiring the information.  Zerilli, 656 F.2d at 712-14.

In arguing that the defendant cannot satisfy the balancing test, the movants focus on the fact that the documents sought are not central to the defendant's case.  See NBC Mem. at 16; N.Y. Times' Mem. at 23.  This argument, however, misses the mark by conflating the analytical process through which any privilege determination would be made.  Before reaching the question of privilege, the Court must first determine, as it has already done, whether the defendant has satisfied the Nixon standards.  Resolution of this predicate question determines what, if any, documents should be produced.  And under Nixon, the Court would only order production of documents that are both relevant and admissible.  After the Court resolves the Rule 17(c) questions, the Court will, as it is now doing, turn to the question of whether the movants can assert a privilege over the documents that the Court ordered produced as relevant and admissible.  Therefore, the movants' argument that the defendant cannot overcome the privilege is wholly without merit because the argument ignores the reality that, at this stage of the analytical process, the only documents that are at issue are those that have been deemed relevant and admissible.

With that in mind, there can be no doubt that the defendant could overcome any common law reporters' privilege.  First, as already stated, the only documents that are at issue are those that are relevant and admissible.  Accordingly, those documents, by their very nature, are documents that will make it more or less probable that the defendant committed the charged offenses.  Specifically, the documents sought by the defendant here will challenge the credibility and recollection of the news reporters whose conversations with the defendant form the factual predicate for several offenses in the indictment.  Thus, these documents are crucial to the

39

defendant's case and go the heart of his defense.  Moreover, the very nature of these documents, i.e., reporters' notes and their draft articles, could only be obtained from the movants; thus, there are no alternative sources for acquiring these documents.  Accordingly, on the record in this case, the defendant has undoubtedly overcome any possible assertion of a common law reporters' privilege.

## VI.    Conclusion

For the reasons discussed above, this Court will grant reporter Judith Miller's motion to quash, and grant in part and deny in part the remaining motions.  Therefore, at the appropriate times as designated in this opinion, those documents subject to production must be produced to the defendant so that they can be used as impeachment or contradiction evidence during the trial. In addition, based on the facts of this case, this Court declines to recognize a First Amendment reporters' privilege.  And, the Court concludes that any common law reporters' privilege that may exist has been overcome by the defendant.

**SO ORDERED** this 26th day of May, 2006.[29]

_____
REGGIE B. WALTON
United States District Judge

---

[29] An Order consistent with this Court's ruling accompanies this Memorandum Opinion.